## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-322

SHERRY STEWART

VERSUS

MALRICK BATTS

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 251,440
HONORABLE PATRICIA EVANS KOCH, DISTRICT JUDGE

**********

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Phyllis M. Keaty, and Candyce G. Perret, Judges.

**AFFIRMED.**

R. Greg Fowler
3918 B Independence Drive
Alexandria, LA 71303
Telephone: (318) 487-9200
COUNSEL FOR:
    Plaintiff/Appellee - Sherry Stewart

David Cleveland Hesser
Leo J. "Trey" Flynn, III
Hesser & Flynn, A Limited Liability Partnership
2820 Jackson Street
Alexandria, LA 71301
Telephone: (318) 542-4102
COUNSEL FOR:
    Defendant/Appellant - Malrick Batts

**THIBODEAUX, Chief Judge.**

The defendant/appellant, Malrick Batts, appeals the trial court's judgment granting custody of his teenaged son to the son's maternal grandmother, plaintiff/appellee, Sherry Stewart.[1] Finding no abuse of discretion on the part of the trial court, we affirm the judgment awarding custody to Sherry Stewart.

## I.

## ISSUES

We must decide:

(1)     whether the trial court committed reversible error by applying the wrong legal standard;  and

(2)     whether the trial court abused its discretion in using documents not entered into evidence to assist in determining the custody issue.

## II.

## FACTS AND PROCEDURAL HISTORY

Because thirteen-year-old C.R.[2] got in trouble at school, he was beaten by his father, Malrick Batts, leaving the child with bruises and whelps on his wrists, arms, shoulder, back, and buttocks, such that he was unable to sit.  C.R. wrote a letter to his imprisoned mother, Brandi Rutter, telling her about the beating, the pain and bruises, and stating that the father whipped him too hard and for reasons "not called for."  C.R. said in the letter that his father "put his foot on my neck and said he would break it."  C.R. asked his mother to please help him to

---

[1] Mrs. Stewart requested permanent custody and child support after being granted temporary custody.

[2] Initials are used to ensure the confidentiality of the minor and to protect his or her identity, in accordance with Uniform Rules—Courts of Appeal, Rule 5-2.

go live with his grandmother or his uncle. Mr. Batts intercepted the letter and wrote at the bottom of it, "I sure did whip his ass and I will do it again & break his neck." He then sent the letter on to the child's mother. The Office of Child Services (OCS) met with C.R., and a doctor confirmed the bruising which remained for some time after the whipping event. On November 3, 2014, the maternal grandmother, Sherry Stewart, filed for immediate, ex parte, temporary custody and for a protective order, attaching the letter written by C.R. with the comments of the father written at the bottom. Temporary custody was granted to Mrs. Stewart, along with the protective order. The trial judge ordered only a four-hour, supervised visitation for Mr. Batts on Sundays at the home of Mrs. Stewart, pending a hearing.

Mrs. Stewart subsequently filed a rule for custody and child support. An interim custody arrangement was agreed to in open court, giving Mr. Batts visitation for three weekends per month. At the time of the trial on permanent custody, C.R. was fifteen and had been living with his grandmother and her husband for almost two years. The issue at trial was whether the custody of the minor child should be returned to the father or should remain with the grandmother, Mrs. Stewart. Mrs. Stewart was awarded custody, and Mr. Batts filed this appeal.

III.

**STANDARD OF REVIEW**

The standard of review for the appellate court in child custody cases has been well-established by this court, as stated in *Hawthorne v. Hawthorne*, 96-89, p. 12 (La.App. 3 Cir. 5/22/96), 676 So.2d 619, 625, *writ denied*, 96-1650 (La. 10/25/96), 681 So.2d 365, "The trial court is in a better position to evaluate the best

2

interest of the child from its observances of the parties and witnesses; thus, a trial court's determination in a child custody case is entitled to great weight on appeal and will not be disturbed unless there is a clear abuse of discretion." Further, "[e]ach child custody case must be viewed in light of its own particular set of facts and circumstances with the paramount goal of reaching a decision that is in the best interest of the child." *Bergeron v. Clark*, 02-493, p. 5 (La.App. 3 Cir. 10/16/02), 832 So.2d 327, 330, *writ denied*, 03-134 (La. 1/29/03), 836 So.2d 54. See also *Evans v. Lungrin*, 97-541 (La. 2/6/98), 708 So.2d 731.

*Prather v. McLaughlin*, 16-604, pp. 3-4 (La.App. 3 Cir. 11/2/16), 207 So.3d 581, 584.

## IV.

## <u>LAW AND DISCUSSION</u>

### *The Appellate Legal Standard*

Mr. Batts contends that the trial court committed reversible error by applying the wrong legal standard when it granted permanent custody of the minor child to the child's grandmother, Mrs. Stewart. He asserts that the trial court used the standard of "best interest of the child" instead of "substantial harm" as required by La.Civ.Code art. 133. The record reveals that the trial court properly applied both standards, citing Article 133 and articulating the two-pronged, *redundant dual test* from *Black v. Simms*, 08-1465 (La.App. 3 Cir. 6/10/09), 12 So.3d 1140.

Under La.Civ.Code art. 133 (emphasis added):

If an award of joint custody or of sole custody to either parent would result in *substantial harm* to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment.

The 1993 revision comments to Article 133 trace the origins of the redundant dual test for divesting a parent of custody of his or her child back to 1982 and clarify that it is still applicable. Originally, the two-part statutory test required that "parental custody be shown to be 'detrimental' to the child and that divestiture be 'required to serve the best interest of the child.'" La.Civ.Code art. 133, Revision Comment (b). Comment (b) further states that "it is clear that the heart of the parental primacy concept, the rule that a nonparent always bears the burden of proof in a custody contest with a parent, was not disturbed by the prior statutory enactment, and likewise has not been affected by this revision." *Id.* Thus, it is the grandmother, Mrs. Stewart, as the nonparent, who bears the burden of proving the two prongs under the current law. In *Black v. Simms*, relied upon by the trial court, a panel of this court stated:

> The redundant dual test is a dual-pronged test. *Lions v. Lions*, 488 So.2d 445 (La.App. 3 Cir.1986). First, before a trial court deprives a parent of the custody of his or her child, the trial court must first determine that an award of custody would cause substantial harm to the child. If so, then the courts look at the best interest of the child factors in Article 134 to determine if an award of custody to a non-parent is required to serve the best interest of the child.

*Id*. at 1143.

This is exactly what the trial court did, following a full trial that included testimony from Mr. Batts; his girlfriend, Jennifer Glorioso; the biological mother, Brandi Rutter; the grandmother; Sherry Stewart, and the attorney appointed for C.R., Todd Farrar. Subsequently, in her extensive written reasons for judgment, after quoting Article 133 and the above excerpt from *Black v. Simms*, the trial judge first addressed substantial harm and then fully discussed the twelve

criteria from La.Civ.Code art. 134 for determining the best interest of the child.

The court stated as follows:

> In considering the first prong, the history of this case reveals that when the child was placed with Mrs. Stewart there was a substantial risk of harm thus the issuance of the protective order. This prong has been satisfied based upon review of the record from the protective order along with the findings of the OCS investigation. The concern for the court today is what has changed since that event to reduce the potential for that level of harm to the child from occurring again along with the current status of the child.
>
> . . . .
>
> The trial testimony did not reveal if Mr. Batts sought any treatment or parenting courses as a result of the OCS incident. What was revealed is that Mr. Batts believed that he was correct in his disciplinary actions and threaten[ed] to beat the child again if the child disobeyed. Mr. Batts is a strict disciplinarian such that the child reported to his attorney that "he feared his father" and often times is indifferent to his father. [C.R.] wants a relationship with his father but states that his father is often working. Mr. Batts believes that this is a situation in which the child is guiding the process and only "cried for mama" when he was disciplined.
>
> Of concern to this court is the relative[] lightness given for the event that occurred. The child was beaten by his father and then wrote a letter to his mother who was in prison asking for help. Mr. Batts intercepted that letter and inserted language bragging about what he did to the child then intentionally sent the letter to Ms. Rutter. As a result of that letter, OCS, days later, did an investigation and found significant marks and bruises on the child. OCS documented the child's fear of his father, arranged for a safety plan and the grandmother filed the protective order which awarded her custody.
>
> The testimony provided by the father is that he wants a relationship with his child but also expects the child to meet the father's expectations. Mr. Batts reports that the grandmother is not always making the child available and that visitations are often complicated.

Key to the success of [C.R.], as he quickly matures to adulthood, is the second prong which evaluates what is in the best interest of the child. These factors are significant in examining the long term development of a child. As stated in *Black v. Simms*, a discussion of the twelve "best interest of the child factors" is nevertheless warranted in deciding the best custody arrangement that the child could benefit and flourish. The court shall consider all relevant factors in determining the best interest of the child which specifies 12 factors, but not necessarily limited to those twelve. A discussion of the relevant facts follows each of these factors[.]

The trial court then fully discussed all twelve factors under La.Civ.Code art. 134, which provides as follows:

The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:

(1) The love, affection, and other emotional ties between each party and the child.

(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(6) The moral fitness of each party, insofar as it affects the welfare of the child.

(7) The mental and physical health of each party.

(8) The home, school, and community history of the child.

(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.

(11) The distance between the respective residences of the parties.

(12) The responsibility for the care and rearing of the child previously exercised by each party.

The trial court found that factors one through three, and factor eleven, were evenly applicable to Mr. Batts and Mrs. Stewart. As to factor four, the court acknowledged that C.R. had lived with his father and stepmother after his biological mother went to prison; then Mr. Batts's marriage to the stepmother ended; and C.R. was living with Mr. Batts and a cousin. The court stated that the biological parents appeared to have worked through the challenges until the OCS event; i.e., the beating, occurred. In discussing factor five, the court recounted the challenges that C.R. had endured early on in non-traditional family environments. Mr. Batts and the biological mother were never married; nor did they ever reside together. The family environment was better after Mr. Batts married but worsened after his divorce. The biological mother's boyfriend, with whom she has a child, has not welcomed C.R., and she has had her visits with C.R. at Mrs. Stewart's home. The court found in favor of Mrs. Stewart under factor five regarding permanence as a family unit, stating as follows:

> When the OCS event occurred, the mother was in prison and not able to take custody of [C.R.]. The court awarded Mrs. Stewart custody and she was in a better position to financially and emotionally care for the child and has done so since November, 2014. Today, Brandi (child's mother), is living with her boyfriend with whom she has a child; Mr. Batts (child's father) lives alone, but

7

has frequent overnight visits with his girlfriend [with] whom he has a minor child; and Mrs. Stewart (child's grandmother) lives with her husband.

The trial testimony also reflects that Mr. Batts, who is now single, has a total of seven children with five different mothers. The ages of the children at the time of trial ranged from age nineteen to age two. Mr. Batts also testified that he works two jobs for a total of sixty to sixty-five hours per week.

In discussing factor six, the moral fitness of the parties, the trial court recounted the challenges of the biological parents. The mother struggles with addiction, while Mr. Batts is "a hard-working man challenged with practicing appropriate discipline and often is not available due to his work schedule." Mrs. Stewart, on the other hand, had been providing C.R. with a loving and stable environment since she was granted temporary custody in 2014.

Under factor seven, the trial court pointed to the mother's addiction and the father's limited parenting skills. The court again found the grandmother, Mrs. Stewart, to be physically and mentally capable of caring for C.R. with no evidence of any challenges. As to factor eight, regarding home, school, and community, the trial court found:

> In the life of a teenager, home, school and community is all important. [C.R.] presented as a typical teenager with hopes of the future and current enjoyment of his present school. There were conversations about his wanting to attend school with his sibling however he reported to his attorney that he was also happy in his current school environment. The 2015/2016 yearbook recognized [C.R.] as freshman of the year; evidence that he has acclimated and has been well accepted into his school. His grandmother reported that [he is] engaged in his church and in activities around the home. Since November 2014 [C.R.] has established himself and is comfortable.

Under the reasonable preference of the child factor, number nine, the trial court found that C.R. feared his father and always had, and she found his preference for his maternal grandmother, Mrs. Stewart, reasonable. The court also mentioned that C.R.'s current school had four-day weeks which allowed him to spend long weekends with his siblings. We further note that Todd Farrar, attorney for C.R., testified that C.R. was afraid of his father before and after the custody event, always had been, and nothing had changed since the event.

Under factor ten, each party's ability and willingness to foster the child's relationship with the other party, the court found that visits with the father had continued while C.R. was in the custody of his grandmother, even though the parties' relationships with each other had become strained. Finally, under factor twelve, the court found that after the OCS event, it was the grandmother who had made the efforts to provide C.R. with a loving and stable environment.

The record also reveals that the father did not provide C.R. with vision or dental care, as C.R. had numerous cavities, and his glasses were too small and had the wrong prescription when C.R. first went to live with his grandmother. Further, while with his grandmother, C.R. received very little in the way of clothing, food, and cash from his father. The grandmother provided all of these things, including medical, dental, and vision care, and she encouraged C.R.'s church, drama, and sports activities, providing transportation to all events and practices. While in her care, C.R. was elected freshman favorite and voted onto the student council. In weighing all of the factors of La.Civ.Code art. 134, the trial court found, under the second prong of the dual prong test, that it was in C.R.'s best interest to remain with his grandmother, Sherry Stewart.

Mr. Batts argues that the trial court did not evaluate "substantial harm" at the time of trial but rather discussed it only in terms of the event that had occurred two years before trial. We disagree. As seen above, the trial court repeatedly discussed the ongoing challenges that Mr. Batts had with limited parenting skills, with no indication of change, and it discussed C.R.'s ongoing fear of his father. The trial court also articulated:

> Parenting is no easy task and further, not a task that can be taught overnight. Parenting is an ongoing practice refined through trial and error. Often times we look to our individual customs, family, and our parents as a blueprint for the approach taken with our children. The Court has now considered the development of the child pre and post the OCS event, current stability of the minor child in school while with Mrs. Stewart (his maternal grandmother); the minor child's current relationship with his siblings; and weighing all these factors the court is of the opinion that the current custody arrangement is the correct one.

> An award of custody to a non-parent is certainly one that should not be taken lightly, however the situation that brought about the change in custody is significant and cannot be ignored. Mr. Batts continues to be a father who works multiple jobs to support his children which is commendable, however learning how to appropriately parent children, even as they reach[] the challenging teenage years, is critical for the young person to reach their full potential and is a key part of parenting. The concern as noted is that Mr. Batts appeared to be proud of his disciplinary action and threatened further harm to his child. A healthy fear of a parent is certainly something that is required but the level of fear that [C.R.] had of his father is, by far, not the healthy image a child should have of a parent.

> Ms. Stewart has provided [C.R. with] becoming fully engaged in his physical home, in a church home and thriving in his school home. There have been no reports of behavioral incidents in his school and the grandmother has kept visitation going with both the mother and father. The visits with the father need to improve and be more consistent with little interference by the grandmother or mother. The uniqueness of the current school setting (4

day school week) offers a benefit to this situation, in that [C.R.] can have extended weekends with his father and siblings. This court sees that it is in the best interest of this child to have that contact so that a healthier relationship between [C.R.] and his father can develop.

The Court also encourages Mr. Batts to seek out information on parenting of teenagers and younger children because he is not only a father to [C.R.] but to the younger child with Jennifer Glorioso. Mr. Batts has many more years ahead of him as a father and one day a grandfather. The OCS event needs to be a one-time event and not something to repeat with [C.R.] or with any other child.

Consistent with the above, the trial court's judgment ordered that Mr. Batts have visitation with C.R., at a minimum, every other weekend, from Friday at 5:00 p.m. through Monday at 5:00 p.m., as long as C.R. had a four-day school schedule. The court also ordered that the parties submit a visitation plan to conform with the needs of the child and those of both parents. The trial court made it clear that Mr. Batts still needed to work on parenting, implicitly finding that it would be harmful to grant him custody, and that it was in C.R.'s best interest to reside with his grandmother and to obtain an improved relationship with his father through generous visitation. It is now well-settled that the *best interest of the child* is the overriding test and the primary consideration for *all* child custody determinations. *See Tracie F. v. Francisco D.*, 15-1812 (La. 3/15/16), 188 So.3d 231. We find no merit in Mr. Batts's argument that the trial court used the wrong legal standard in determining the custody issue in this case.

### Reference to Documents Not Entered Into Evidence

Mr. Batts further assigns as error the trial court's references to the OCS examination, stating that no such evidence was ever entered into the record. The trial transcript reveals that the OCS file was requested in open court and that

11

the trial judge obtained the original file during trial and made its receipt a part of the record when the OCS representative hand-delivered it to her in the courtroom for an in-camera inspection. As counsel for Mrs. Stewart points out, the record was used and discussed in the trial court's chambers, and it was used and discussed in open court by the trial judge, without objection. In fact, the record reveals that the trial court read from the OCS report in open court without objection.

More specifically, the court called the parties and counsel into chambers. When they returned to the courtroom and went back on the record, the trial judge stated as follows:

BY THE COURT:

Well, we all had a little pretrial, I might as well make a record of it. As there was no one not there. All right. I did receive the record from OCS and I'm keeping it tonight. They allow in-camera inspections . . . . The lawyers at a pretrial told me they thought it was a nonfinding, that's why I asked for the record and I received it. And so there was - yes, there was a finding. And what they do with teenagers typically is they feel like teenagers are old enough to call the police on their own so they leave them there. Philosophically I totally disagree as do a lot of people as [to] that. So what they did was create a safety plan. What I could not tell was the date of the letter that was sent to Ms. Rutter. So that the letter then went to Ms. Rutter who then contacted her mother who then triggered it to the school system to say please call an investigation. And the point to all that is by the time he saw a doctor - so it looks like they received the report on October the 16th. So they took him to the doctor - what did I tell you that date was a while ago?

BY MR. FOWLER:

October 21st.

BY THE COURT:

21st. So here it was even five more days later that the doctor indicated he had bruising on – I've got to find

12

it again. And that's what has triggered the say-so is because he still had significant bruising.

BY MR. FOWLER:

Bruising on wrist, shoulder and buttocks . . . .

BY THE COURT:

Yeah. Wrist, shoulder and buttocks. There it is. There's the - and that's dated October the 21st. He still had resolving bruises is what the doctor indicates. He saw Doctor Mitchell. And had linear arm abrasions upon his shoulder and he also had bruising to his buttocks. So this was days and days later. So this was not a whipping. This would have been at the level of a beating. And so OCS put a safety plan in place with a cousin who supposedly lived at the house at that time with the cousin swearing she would contact if something else should happen. And in the meantime this other stuff got triggered. And it also said the child was fearful. That's how it rose to a level - and also on the investigation it rose to a higher level because the child had bruising and - so they rate their cases too. And it rose to a higher level because the child stated he was fearful and had those bruising[s]. So it wasn't a priority one case, it was a priority two, so that's why it took them a couple of days to get him to the doctor.

Thus, the trial court read from the OCS report, and Mr. Flynn, counsel for Mr. Batts, did not object to the court's use of the OCS report, or the court's finding based upon the report. It is well-settled under La.Code Civ.P. art. 1635, that such failure to contemporaneously object to the trial court's action constitutes a waiver of the right to complain on appeal. *Broussard v. West-Cal Const. Co., Inc.*, 96-18 (La.App. 3 Cir. 6/12/96), 676 So.2d 743. Accordingly, Mr. Batts's contention regarding the erroneous use of the OCS documents that were not entered into evidence is without merit.

13

V.

## **<u>CONCLUSION</u>**

Based upon the foregoing, we find no abuse of discretion in the trial court's award of custody to Mrs. Stewart. The judgment of the trial court is affirmed. All costs of this appeal are assessed to Malrick Batts.

**AFFIRMED**.